# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| **MULLER MARTINI CORP.** and **MULLER MARTINI MAILROOM SYSTEMS, INC.**, | : <br> : <br> : |
| Plaintiffs/ <br> Counterclaim Defendants, | : <br> : <br> : |
| v. | :     C. A. No. 07-667-*** |
| **GOSS INTERNATIONAL AMERICAS, INC.** and **GOSS INTERNATIONAL CORPORATION,** | :     **JURY TRIAL DEMANDED** <br> : <br> : |
| Defendants/ <br> Counterclaim Plaintiffs/ <br> Third-Party Plaintiffs, | : <br> : <br> : |
| v. | : <br> : |
| **MÜLLER MARTINI HOLDING AG, MÜLLER MARTINI MARKETING AG,** and **GRAPHA HOLDING AG,** | : <br> : <br> : |
| Third-Party Defendants. | : |

## DEFENDANTS' ANSWER, DEFENSES, <br> COUNTERCLAIMS, AND THIRD-PARTY CLAIMS

Goss International Americas, Inc. and Goss International Corporation (collectively, "Goss International"), by their attorneys, respond to the Complaint of Muller Martini Corp. and Muller Martini Mailroom Systems, Inc. as follows:

1.     Goss International admits that the Complaint purports to state a cause of action for patent infringement arising under the patent laws of the United States, that jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1338(a) and that venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b).

2.      Admitted.

3.      Admitted.

4.      Goss International admits that Goss International Americas, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Dover, New Hampshire.

5.      Admitted.

6.      Goss International admits that the document attached as Exhibit "A" to the Complaint bears a U.S. Patent No. 6,175,775, shows a date of January 16, 2001 and is entitled "Method For Optimizing The Production Output Of An Apparatus Processing Flat Items."  To the extent Exhibit "A" is a true and correct copy of U.S. Patent No. 6,175,775, the document speaks for itself.  Goss International is without sufficient knowledge or information to form a belief as to the truth or falsity of the remaining allegations contained in paragraph 6 of the Complaint and, therefore, denies them.

7.      Denied.

8.      Goss International admits that it had knowledge of the '775 patent.  Goss International denies the remaining allegations contained in paragraph 8 of the Complaint.

9.      Denied.

10.     Denied.

### DEFENSES

For their Defenses, Goss International Americas, Inc. and Goss International Corporation (collectively, "Goss International") state as follows:

### First Defense

Goss International has not infringed, directly or indirectly, literally, or by the doctrine of equivalents, any valid and enforceable claim of the '775 patent.  Nor has Goss

International contributed to infringement by others or actively induced others to infringe the '775 patent.

## Second Defense

The '775 patent is invalid for failure to comply with one or more of the provisions of 35 U.S.C. §§ 101 *et seq.*, including, but not limited to, sections 101, 102, 103, and/or 112.

## Third Defense

The doctrine of Prosecution History Estoppel applies to preclude a finding of infringement under the Doctrine of Equivalents.

## Fourth Defense

On information and belief, the equitable doctrines of laches, estoppel and/or acquiescence bar some or all of plaintiffs' claims for damages and other relief.

## Fifth Defense

On information and belief, the '775 patent is unenforceable due to inequitable conduct before the United States Patent & Trademark Office by plaintiffs and their Swiss affiliates (collectively, the "Muller Martini Companies"). The facts supporting Goss International's Fifth Affirmative Defense are more fully set forth below in Count IV of Goss International's Counterclaim and Third-Party Claims.

## Sixth Defense

On the basis of the proceedings in the United States Patent & Trademark Office during the prosecution of the application that matured into the '775 patent, and statements made by or on behalf of the patentees therein, plaintiffs are estopped from construing these patents to cover any product manufactured, used, offered for sale, and/or sold by Goss International.

## COUNTERCLAIMS AND THIRD-PARTY CLAIMS

Defendants, Counterclaim Plaintiffs and Third-Party Plaintiffs Goss International Americas, Inc. and Goss International Corporation (collectively, "Goss International") plead the following counterclaims against Plaintiffs and Counterclaim Defendants Muller Martini Corp. and Muller Martini Mailroom Systems, Inc., and third party claims against Müller Martini Holding AG, Grapha Holding AG, and Müller Martini Marketing AG:

### The Parties

1.      Goss International Americas, Inc. is a Delaware corporation with its principal place of business in Dover, New Hampshire.

2.      Goss International Corporation is a Delaware Corporation with its principal place of business in Bolingbrook, Illinois.

3.      Muller Martini Corp. ("Muller Martini") is a New York corporation with its principal place of business in Hauppauge, New York.

4.      Muller Martini Mailroom Systems, Inc. ("Mailroom Systems") is a Delaware Corporation with its principal place of business in Allentown, Pennsylvania.

5.      Müller Martini Holding AG ("MMH") is a company organized under the laws of the country of Switzerland.

6.      Müller Martini Marketing AG ("MM Marketing") is a company organized under the laws of the Country of Switzerland.

7.      Grapha Holding AG ("Grapha") is a company organized under the laws of the country of Switzerland.

8.      Muller Martini, Mailroom Systems, MMH, MM Marketing, and Grapha (collectively the "Muller Martini Companies") are related entities within the Muller Martini family of companies.

4

## Jurisdiction And Venue

9.      Goss International's Counterclaims and Third-Party Claims arise under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-02; the patent laws of the United States, 35 U.S.C. § 1 *et seq*.; and the antitrust laws of the United States, 15 U.S.C. §§ 2, 15.

10.     Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1338(a) and, 1367(a) and 2201-02.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b).

11.     The Muller Martini Companies are subject to personal jurisdiction in this District.

### COUNT I - COUNTERCLAIM FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT
(Against Muller Martini and Mailroom Systems)

12.     Goss International repeats and realleges paragraphs 1-11 of its Counterclaims and Third-Party Claims as if fully set forth herein.

13.     An actual controversy exists between Goss International on the one hand, and Muller Martini and Mailroom Systems on the other hand regarding infringement of U.S. Patent No. 6,175,775 (the "'775 patent") by virtue of the allegations made against Goss International in the Complaint.

14.     Goss International has not infringed, directly or indirectly, literally, or by the doctrine of equivalents, any valid and enforceable claim of the '775 patent.  Nor has Goss International contributed to infringement by others or actively induced others to infringe the '775 patent.

15.     Goss International is entitled to a judgment from this Court that the '775 patent is not infringed by Goss International.

16.    This is an exceptional case entitling Goss International to an award of attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNT II - COUNTERCLAIM FOR DECLARATORY JUDGMENT OF INVALIDITY
### (Against Muller Martini and Mailroom Systems)

17.    Goss International repeats and realleges paragraphs 1-16 of its Counterclaims and Third-Party Claims as if fully set forth herein.

18.    An actual controversy exists between Goss International on the one hand, and Muller Martini and Mailroom Systems on the other hand regarding the validity of the '775 patent by virtue of the allegations contained in the Complaint.

19.    The '775 patent is invalid for failure to comply with one or more of the provisions of 35 U.S.C. §§ 101 *et seq.*, including, but not limited to, sections 101, 102, 103, and/or 112.

20.    Goss International is entitled to a judgment from this Court that the '775 patent is invalid.

21.    This is an exceptional case entitling Goss International to an award of attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

## COUNT III - COUNTERCLAIM AND THIRD-PARTY CLAIMS FOR PATENT INFRINGEMENT
### (Against Muller Martini, Mailroom Systems, MMH, MM Marketing, and Grapha)

22. Goss International repeats and realleges paragraphs 1-21 of its Counterclaims and Third-Party Claims as if fully set forth herein.

23.    On March 19, 1996, the United States Patent and Trademark Office duly and lawfully issued U.S. Patent No. 5,499,803 (the "'803 patent") for a "Collator Without

A Main Line Drive Shaft." A true and correct copy of the '803 patent is attached hereto at Exhibit "A."

24.    Goss International is the owner, by assignment of the '803 patent. Goss International owns all right, title, and interest in and has standing to sue for past and future infringement of the '803 patent.

25.    Goss International has marked its products embodying the claims of the '803 patent in accordance with 35 U.S.C. § 287.

26.    The '803 patent is presumed to be valid pursuant to 35 U.S.C. § 282. The '803 patent is, in fact, valid.

27.    The Muller Martini Companies have infringed, directly and/or through acts of contributory infringement or inducement, and continue to infringe, one or more claims of the '803 patent, in violation of 35 U.S.C. § 271 by making, using, selling, offering for sale, and/or importing into the United States products including the SLS 3000 and SLS 4000 inserters, covered by one or more claims of the '803 patent. The Muller Martini Companies have committed acts of infringement and/or inducement of infringement in this District.

28.    Goss International has been irreparably damaged by the infringing acts of the Muller Martini Companies and will continue to be irreparably damaged unless the Muller Martini Companies are enjoined from further acts of infringement.

29.    Goss International is entitled to recover damages adequate to compensate it for the Muller Martini Companies' acts of infringement.

30.     On information and belief, the Muller Martini Companies' infringement and inducement of infringement has been intentional and willful. This is also an exceptional case within the meaning of 35 U.S.C. § 285.

**COUNT IV - COUNTERCLAIM FOR ATTEMPTED MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**(Against Muller Martini and Mailroom Systems)**

31.     Goss International repeats and realleges paragraphs 1-30 of its Counterclaims and Third-Party Claims as if fully set forth herein.

32.     Muller Martini and Mailroom Systems (for this Count only, "the Muller Martini Companies" includes only Muller Martini and Mailroom Systems) have asserted a claim of infringement of the '775 patent against Goss International in this lawsuit.

33.     The patentee knowingly and intentionally procured the '775 patent through fraud. To obtain the '775 patent, the patentee knowingly and willfully omitted and misrepresented material prior to the United States Patent & Trademark Office (the "PTO").

34.     When the patentee submitted and prosecuted the application that matured into the '775 patent, it had a duty under 37 C.F.R. 1.56 to bring to the attention of the PTO any material prior art or other information cited or brought to its attention in any related foreign patent application.

35.     The patentee violated the duty of disclosure under 37 C.F.R. 1.56 by withholding from the PTO the material prior art reference: Beitz et al. "DUBBEL TASCHENBUCH FUER MASCHINENBAU" (Springer-Verlag, 15th Ed., 1995) (the "Dubbel prior art reference") that was cited in the European Patent Office in the patentee's counterpart prosecution of EP 0 749 927 B1 (the "'927 patent").

36.     The patentee violated the duty of disclosure under 37 C.F.R. 1.56 by withholding from the PTO the material prior art reference: G. Schmidt, GRUNDLAGEN DER REGELUNGSTECHNIK (Springer-Verlag 1982) (the "Schmidt prior art reference"), that was cited in the European Patent Office in the patentee counterpart prosecution of the '927 patent.

37.     The patentee filed U.S. Application Serial No. 08/663,635 (the "'775 patent application") on June 14, 1996 and filed the '927 European application on June 17, 1996, both claiming the priority of CH 1825/95.

38.     On November 14, 1997, the European Patent Office informed the patentee that a third-party objection to the '927 application was filed citing the Dubbel prior art reference.

39.     The patentee knew of the materiality and significance of the Dubbel prior art reference no later than November 14, 2007. Despite a duty to do so, the patentee failed to submit the Dubbel prior art reference to the PTO for consideration within three months of first learning of it in the counterpart '927 European prosecution.

40.     On June 6, 1998, the European Patent Office rejected certain claims of the '927 application, based in part on the Dubbel prior art reference and based in part on the Schmidt prior art reference.

41.     Thus, no later than June 8, 1998, the patentee was provided with further evidence of the materiality of the Dubbel prior art reference.

42.     In addition, no later than June 8, 1998, the patentee was provided with the evidence of the materiality of the Schmidt prior art reference.

43.     On June 29, 1998, the patentee filed a Continued Prosecution Application with the PTO in the '775 patent application.

44.     At this time, the patentee could have submitted the Dubbel prior art reference and the Schmidt prior art reference to the PTO for consideration in accordance with 37 C.F.R. 1.97(b)(1).

45.     Despite a duty to do so, the patentee failed to submit the Dubbel prior art reference or the Schmidt prior reference to the PTO for consideration.

46.     On December 7, 1998, the PTO issued a Non-Final Office Action against the '775 patent application, rejecting the claims as invalid over the prior art.

47.     On December 12, 1998, the patentee amended the '927 application before the European Patent Office by, among other things, including the Dubbel prior art reference and the Schmidt prior art reference in order to overcome the rejection.

48.     Thus, on December 12, 1998, the patentee acknowledged materiality of the Dubbel prior art reference and the Schmidt prior art reference by adding a discussion of both prior art references to the '927 application.

49.     On June 7, 1999, the patentee filed a response to the Non-Final Office Action in the '775 patent application.

50.      At this time, the patentee could have submitted the Dubbel prior art reference and the Schmidt prior art reference to the PTO for consideration in accordance with 37 C.F.R. 1.97(c)(2).

51.     Despite a duty to do so, the patentee again failed to submit the Dubbel prior art reference and the Schmidt prior art reference to the PTO for consideration.

52.     On August 20, 2000, the patentee received a Notice of Allowance regarding the '775 patent application from the PTO, stating "The application . . . is allowed for issuance as a patent.  Prosecution on the merits is closed."

53.     At this time, the patentee could have submitted the Dubbel prior art reference and the Schmidt prior art reference to the PTO for consideration in accordance with 37 C.F.R. 1.97(b)(1) and M.E.P. § 609, page 600-09 (7th Ed. 7/98) by filing either a Continued Prosecution Application or by filing a Continuation Application.

54.     If a Continuation Prosecution Application or a Continuation Application were filed along with an Information Disclosure Statement submitting the Dubbel prior art reference and the Schmidt prior art reference, prosecution on the merits would have been reopened and the '775 patent would have been subject to further examination and possible rejection by the Patent Examiner.

55.     Despite a duty to do so, the patentee again failed to submit the Dubbel prior art reference and the Schmidt prior art reference to the PTO.

56.     Instead, on September 21, 2000, the patentee filed a Letter with the PTO, requesting without any explanation that the Dubbel and Schmidt prior art references "be placed in the Patent and Trademark Office file," knowing that in accordance with 37 C.F.R. 1.97(i), the Dubbel and Schmidt prior art references would not be considered by the PTO.

57.     The patentee did not provide either an English language translation of the Dubbel and Schmidt prior art references or a concise explanation of the relevance of the Dubbel and Schmidt prior art references, as required by 37 C.F.R. 1.98(a)(3)  and (c).

58.     The patentee committed fraud on the PTO by not submitting the Dubbel prior art reference and the Schmidt prior art reference for consideration by the Examiner. By requesting that the Dubbel and Schmidt prior art references simply "be placed in the file," rather than considered, the patentee evidenced both its knowledge of the materiality of the Dubbel and Schmidt prior references and its clear intent that the Examiner not consider the Dubbel and Schmidt prior art references, thus assuring that the '775 patent would proceed to grant without further review by the Examiner.

59.     Further, by not submitting an English translation or concise explanation of the relevance of the Dubbel prior art reference or the Schmidt prior art reference, the patentee evidenced its clear intention to foreclose any remaining possibility that the Examiner could review or consider the Dubbel or Schmidt prior art references and thus prevent the '775 patent from proceeding to grant.

60.     The patentee knowingly and intentionally submitted the Dubbel prior art reference and the Schmidt prior art reference to the PTO in such a way that would preclude any review or consideration by the PTO.

61.     As a result of the patentee intentional and fraudulent conduct, the PTO issued the '775 patent.

62.     The relevant geographic market is the United States. The relevant product market is the market for newspaper inserters for mid-to high-circulation applications with many inserts and many zones.

63.     The Muller Martini Companies already possess substantial market power in the relevant market in the United States, and there is a high likelihood and a dangerous probability that they will be successful in achieving and maintaining monopoly power in

12

the United States if the '775 patent is enforced to the extent it is advocated in this suit to exclude Goss and others from the relevant market.

64.     The Muller Martini Companies have attempted to achieve and maintain monopoly power through unlawful and exclusionary means that were designed to defeat competition in violation of 15 U.S.C. § 2.   These means include:  (a) knowingly and fraudulently procuring the '775 patent, and (b) knowingly enforcing the fraudulently obtained '775 patent in the instant lawsuit for the purpose of preventing Goss's sales of collators.

65.     Through such actions, the Muller Martini Companies attempted and continue to attempt to monopolize the relevant market and have a likelihood of success of monopolizing that market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

66.     The Muller Martini Companies' exclusionary conduct substantially affects the competitive conditions in the relevant market by attempting to exclude others from the market, thereby allowing the Muller Martini Companies to limit supply and extract monopoly prices.

67.     Goss International has been injured as a direct result of the Muller Martini Companies' anticompetitive conduct.   Goss therefore seeks recovery of damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

## PRAYER FOR RELIEF

WHEREFORE, Goss International respectfully requests that this Honorable

Court:

A.     Enter judgment dismissing with prejudice Muller Martini and Mailroom Systems' Complaint;

B.     Enter judgment that Goss International does not infringe any of the claims of the '775 patent;

C.     Enter judgment that the '775 patent is invalid;

D.     Enter judgment that the '775 patent is unenforceable due to inequitable conduct in front of the United States Patent & Trademark Office;

E.     Declare that this case is an exceptional case within the meaning of 35 U.S.C. § 285 and award Goss the costs of this action, including attorneys' fees;

F.     Enter an injunction against Muller Martini Mailroom Systems, Inc., Müller Martini Holding AG, Grapha Holding AG, and Müller Martini Marketing AG prohibiting further infringement, inducement, or contributory infringement of the '803 patent;

G.     Award damages adequate to compensate Goss International for the infringement that has occurred together with prejudgment interest from the date infringement of the '803 patent incurred;

H.     Award Goss International treble damages and all other damages permitted pursuant to 35 U.S.C §285;

I.     Award Goss the full measure of damages available under Section 4 of the Clayton Act, 15 U.S.C. § 15; and

J.     Award such other and further relief as justice may require.

## JURY DEMAND

Goss International demands a trial by jury on all issues so triable.

DATED: November 29, 2007        **EDWARDS ANGELL PALMER & DODGE LLP**

                                */s/ John L. Reed*
                                _____
                                John L. Reed (I.D. No. 3023)
                                Denise Seastone Kraft (I.D. No. 2778)
                                Joseph B. Cicero (I.D. No. 4388)
**OF COUNSEL:**                 919 North Market Street, 15th Floor
                                Wilmington, Delaware 19801
William G. Schopf              302.777.7770
Bradley P. Nelson
Todd H. Flaming
Marcus D. Fruchter
Lindsay Wilson Gowin
**SCHOPF & WEISS LLP**
One South Wacker Drive, 28th Floor
Chicago, Illinois 60606
Phone:  312.701.9300

                                *Attorneys for Defendants, Counterclaim Plaintiffs,*
                                *and Third-Party Plaintiffs*
                                *Goss International Americas, Inc. and*
                                *Goss International Corporation*

# Exhibit A

US005499803A

# United States Patent [19]

## Farr

[11] **Patent Number:** 5,499,803

[45] **Date of Patent:** Mar. 19, 1996

[54] **COLLATOR WITHOUT A MAIN LINE DRIVE SHAFT**

[75] Inventor: **Alan S. Farr**, Huber Heights, Ohio

[73] Assignee: **AM International, Inc.**, Mt. Prospect, Ill.

[21] Appl. No.: **344,499**

[22] Filed: **Nov. 23, 1994**

[51] Int. Cl.$^6$ ............................ **B65H 39/02; B65H 3/44**

[52] U.S. Cl. ............................ 270/54; 270/58; 271/9.012

[58] Field of Search ...................... 270/54, 58; 271/9.01, 271/9.12, 9.13

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,825,247 | 7/1974 | Fernandez-Rena et al. ............. | 270/58 |
| 5,013,022 | 5/1991 | Graushar ......................... | 270/54 X |
| 5,067,697 | 11/1991 | Honegger ......................... | 270/54 X |
| 5,100,116 | 3/1992 | Graushar ......................... | 270/54 X |
| 5,141,216 | 8/1992 | Ballestrazzi et al. ............. | 271/9.01 X |
| 5,203,549 | 4/1993 | Bryson, Sr. et al. .............. | 270/58 X |
| 5,253,857 | 10/1993 | Ballestrazz et al. ............. | 271/9.12 X |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 61-229771 | 10/1986 | Japan ......................... | 270/58 |

*Primary Examiner—John E. Ryznic*

*Attorney, Agent, or Firm—Tarolli, Sundheim & Covell*

[57] **ABSTRACT**

A collator (10) comprises a collating conveyor (12) and a plurality of hopper sections (20, 40, 60) located along the conveyor. Each section includes at least one signature pile support (21–24, 41–44, 61–64) for holding signatures to be fed to the conveyor. Each section also includes a signature feeder (25–28, 45–48, 65–68) for feeding a signature from the pile support to the conveyor. Each section has its own respective motor (32, 52, 72) for driving the associated feeder. Each motor includes its own respective controller (30, 50, 70) for controlling the associated motor to control the feeding of signatures from the associated feeder to the conveyor. Each controller includes its own respective motor drive for controlling operation of the associated motor. A master controller (14) interconnecting the motor drives controls speed of operation and coordinates timing of operation of the motor drives. Alternatively, each pile support (21a–24a) could have its own respective feeder (25a–28a) for feeding a signature from the associated pile support to the conveyor (12a). In this case, each feeder would include its own respective motor (112, 122, 132, 144) for driving the associated feeder. Also, each motor would include its own respective controller (110, 120, 130, 140) for controlling the associated motor to control the feeding of signatures from the associated feeder to the conveyor.

**26 Claims, 2 Drawing Sheets**



GI 099689



Fig.1

Attorneys Eyes Only



Fig.2

Attorneys Eyes Only

5,499,803

### 1

## COLLATOR WITHOUT A MAIN LINE DRIVE SHAFT

### TECHNICAL FIELD

The present invention relates to a collator having a plurality of signature feeders, and is particularly directed to such a collator without a main line drive shaft.

### BACKGROUND OF THE INVENTION

Collators for assembling a plurality of signatures into groups of collated signatures, such as books or magazines, are well known in the art. A typical collator includes a single main line drive shaft which drives a collating conveyor and feeders which feed signatures to the collating conveyor. The feeders are spaced along the collating conveyor. The main line drive shaft has a longitudinal central axis and is rotatable about its longitudinal central axis. A drive motor is connected to one end of the main line drive shaft to drive the shaft about its longitudinal central axis. The feeders are drivingly connected to the main line drive shaft. The feeders are driven with proper timing to form the books or magazines on the collating conveyor.

Some disadvantages are present when a single main line drive shaft is used to drive a number of feeders spaced along a collating conveyor. One disadvantage is that the position of the feeders cannot be raised or lowered relative to the collating conveyor to better feed signatures onto the collating conveyor. This is because there are rigid mechanical connections between the main line drive shaft and the feeders.

Another disadvantage is that a single main line drive shaft may be relatively long and, therefore, may twist enough about its longitudinal central axis to cause the feeders located a distance from the drive motor to be out of proper timing. The main line drive shaft may twist about its longitudinal central axis because the drive motor driving the shaft may be located at only one end of the shaft. Another drive motor may be connected to the other end of the main line drive shaft to also drive the shaft, but additional cost and drive complexity would be incurred.

Still another disadvantage to a collator having a single main line drive shaft is that to inhibit operation of the feeders, typically mechanical parts are engaged to stop movement of a part. This results in wear of the mechanical parts.

Still another disadvantage is that the task of adjusting a particular feeder to accommodate delivery of a different-sized signature onto the collating conveyor is rather cumbersome. Such an adjustment typically requires the feeder to be first declutched from the single main line drive shaft and then the collating conveyor to be jogged until the desired adjustment is achieved. The feeder is then reclutched to the single main line drive shaft.

### SUMMARY OF THE INVENTION

In accordance with one aspect of the present invention, a collator comprises a collating conveyor and a plurality of hopper sections located along the collating conveyor. Each hopper section includes at least one signature pile support for holding signatures to be fed to the collating conveyor. Each hopper section also includes signature feed means for feeding a signature from a signature pile support to the collating conveyor. Each hopper section has its own respective drive motor which drives the associated signature feed

### 2

means. Each drive motor has its own respective control means which controls the feeding of signatures from the associated signature feed means to the collating conveyor.

Preferably, each control means includes its own respective motor drive which controls operation of the associated drive motor. A master controller interconnects the motor drives. The master controller controls operation and coordinates timing of operation of the motor drives.

In accordance with another aspect of the present invention, a collator comprises a collating conveyor and at least one of hopper section located along the collating conveyor. The hopper section includes a plurality of signature pile supports for holding signatures to be fed to the collating conveyor. Each signature pile support has its own respective signature feed means for feeding a signature from the associated signature pile support to the collating conveyor. Each signature feeder means includes its own respective drive motor for driving the associated signature feed means. Each drive motor includes its own respective control means for controlling the associated drive motor to control the feeding of signatures from the associated signature feed means to the collating conveyor.

### BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing and other features of the present invention will become apparent to one skilled in the art to which the present invention relates upon consideration of the following description of the invention with reference to the accompanying drawings, wherein:

FIG. 1 is a schematic block illustration of a collator embodying the present invention; and

FIG. 2 is a schematic block illustration similar to FIG. 1 and illustrating another embodiment of the present invention.

### DESCRIPTION OF THE PREFERRED EMBODIMENT

The present invention is directed to a collator having a plurality of hopper sections. By way of example, the present invention is illustrated in FIG. 1 as embodied in a collator 10 including a collating conveyor 12 and having three hopper sections 20, 40, 60 for feeding signatures onto the conveyor 12. The hopper section 40 is adjacent to and downstream from the hopper section 20. The hopper section 60 is adjacent to and downstream from the hopper section 40.

The actual number of hopper sections of the collator 10 can be any number of hopper sections. For purposes of explanation, only the three hopper sections 20, 40, 60 are illustrated in FIG. 1. The conveyor 12 moves signatures in a direction indicated by the arrow 15.

Each of the hopper sections 20, 40, 60 includes four signature pile supports. Each of the signature pile supports has its own respective signature feeding mechanism. The hopper section 20 includes four signature pile supports 21, 22, 23, 24 and four feeding mechanisms 25, 26, 27, 28 associated with the four pile supports 21, 22, 23, 24, respectively. The hopper section 40 includes four signature pile supports 41, 42, 43, 44, and four feeding mechanisms, 45, 46, 47, 48 associated with the four pile supports 41, 42, 43, 44, respectively. The hopper section 60 includes four signature pile supports 61, 62, 63, 64 and four feeding mechanisms 65, 66, 67, 68 associated with the four pile supports 61, 62, 63, 64, respectively.

5,499,803

3

The hopper section 20 has its own respective set of jackscrews 29 which enable each of the signature pile supports 21, 22, 23, 24 and the respective feeding mechanisms 25, 26, 27, 28 to be raised or lowered relative to the conveyor 12. The hopper section 40 has its own respective set of jackscrews 49 which enable each of the signature pile supports 41, 42, 43, 44 and the respective feeding mechanisms 45, 46, 47, 48 to be raised or lowered relative to the conveyor 12. The hopper section 60 has its own respective set of jackscrews 69 which enable each of the signature pile supports 61, 62, 63, 64 and the respective feeding mechanisms 65, 66, 67, 68 to be raised or lowered relative to the conveyor 12.

The collator 10 further includes three motor drive controllers 30, 50, 70 and three motors 32, 52, 72 connected via electrical lines 31, 51, 71, respectively, to the three motor drive controllers 30, 50, 70. The three motors 32, 52, 72 are connected via couplings 33, 53, 73, respectively, to three section drive shafts 34, 54, 74. Each of the section drive shafts 34, 54, 74 is associated with a respective one of the hopper sections 20, 40, 60 and drives all of the feeding mechanisms in the particular hopper section to control the speed, acceleration, and timing coordination of the feeding mechanisms.

Three motor position encoders 36, 56, 76 are operatively coupled to the three motors 32, 52, 72, respectively, as shown schematically with dashed lines 38, 58, 78 in FIG. 1. The three encoders 36, 56,76 are connected via electrical lines 37, 57, 77, respectively, to the three motor drive controllers 30, 50, 70. A master drive controller 14 is connected via electrical line 13 to the three motor drive controllers 30, 50, 70.

Each of the motor drive controllers 30, 50, 70 has its own respective memory 35, 55, 75 which stores information about the associated hopper section. For example, the stored information may include information relating to the sizes of the signatures being fed to the conveyor 12 in the different hopper sections. The stored information could be processed by the associated motor drive controller to provide a signal which controls the associated motor so that the motor would be operated to either advance or retard the associated section drive shaft to proper position depending upon the size of the signatures being fed to the conveyor 12 in the particular hopper section. The size information stored in each memory may be downloaded from the master drive controller 14.

A number of advantages result by connecting a section drive shaft to all of the feeders of only one hopper section and using a respective motor drive controller to control operation of the feeders in the particular hopper section. One advantage is that improper timing of feeder operation due to twisting of a shaft is significantly reduced since each hopper section has its own respective relatively short section drive shaft as compared to a relatively long single main line drive shaft. Another advantage is that installation is relatively easier because of reduced alignment difficulties.

Another embodiment of the present invention is illustrated in FIG. 2. Since the embodiment of the invention illustrated in FIG. 2 is generally similar to the embodiment illustrated in FIG. 1, similar numerals are utilized to designate similar components, the suffix letter "a" being associated with the embodiment of FIG. 2 to avoid confusion.

Referring to FIG. 2, the hopper section 20a includes the four signature pile supports 21a, 22a, 23a, 24a and the four feeding mechanisms 25a, 26a, 27a, 28a associated with the four pile supports 21a, 22a, 23a 24a, respectively. The hopper section 20a has the set of jackscrews 29a which

4

enable each of the signature pile supports 21a, 22a, 23a, 24a to be moved relative to the conveyor 12a.

The shafts of four motors 112, 122, 132, 142 are directly connected to the four feeding mechanisms 25a, 26a, 27a, 28a, respectively, to drive and control the speed, acceleration, and timing coordination of the feeding mechanisms. Four motor position encoders 116, 126, 136, 146 are operatively coupled to the four motors 112, 122, 132, 142, respectively, as shown schematically with dashed lines 118, 128, 138, 148 in FIG. 2. The four motors 112, 122, 132, 142 are connected via electrical lines 111, 121, 131, 141, respectively, to four motor drive controllers 110, 120, 130, 140. The four encoders 116, 126, 136, 146 are connected via electrical lines 117, 127, 137, 147, respectively, to the four motor drive controllers 110, 120, 130, 140. The master controller 14a is connected via electrical line 13a to the four motor drive controllers 110, 120, 130, 140.

It should be apparent that each feeding mechanism has its own respective motor and its own respective motor drive controller for controlling the associated motor to control the feeding of signatures from the associated signature pile support to the collating conveyor 12a. The motor 112 and the motor drive controller 110 control operation of the feeding mechanism 21a. The motor 122 and the motor drive controller 120 control operation of the feeding mechanism 22a. The motor 132 and the motor drive controller 130 control operation of the feeding mechanism 23a. The motor 142 and the motor drive controller 140 control operation of the feeding mechanism 24a.

A number of advantages result by providing a separate motor drive controller for each feeding mechanism and signature pile support. One advantage is that each feeder can be selectively inhibited from feeding signatures by inhibiting operation of the associated motor with the associated motor drive controller. By selectively inhibiting operation of the motors for the feeders which are not feeding any signatures, unnecessary wear and tear on these feeders are avoided.

Another advantage is that each feeder can be adjusted easily independently of other feeders. Each feeder can be adjusted using only the associated jackscrews since there is no mechanical connection to a single main line drive shaft. Each feeder can be raised or lowered and/or moved in or out and/or moved left or right. This flexibility provides on the fly phasing to adjust between feeding of signatures and can improve the way a signature is fed onto the conveyor 12a. This flexibility also allows the spacing between adjacent signature pile supports and feeding mechanisms to be easily changed.

Still another advantage is that installation and removal of parts for servicing are relatively easy since there is no mechanical drive connection between the motors 112, 122, 132, 142 and the feeding mechanisms 25a, 26a, 27a, 28a, respectively. Also, since there is no main drive motor, additional signature pile supports and feeding mechanisms can be provided along the conveyor 12a without the need to increase the size of a main drive motor. The collator 10a is, therefore, modular.

Also, since information about the size of the signatures in a particular signature pile support can be loaded into the memory of the associated motor drive controller, no declutching of the associated feeder or jogging of the conveyor is required to adjust the associated feeder to accommodate feeding of a different-sized signature onto the conveyor 12a. With the size information loaded into the memory, the associated motor drive controller is able to

Attorneys Eyes Only

GI 099693

5,499,803

5

actuate the associated motor to adjust the associated feeder relative to the conveyor 12a when such an adjustment is desired. The adjustment is, therefore, relatively easy and requires no declutching of the feeder.

From the above description of the invention, those skilled in the art to which the present invention relates will perceive improvements, changes and modifications. Such improvements, changes and modifications within the skill of the art to which the present invention relates are intended to be covered by the appended claims.

Having described the invention, the following is claimed:

1. A collator comprising:

a collating conveyor;

a plurality of hopper sections located along said collating conveyor, each hopper section including (i) at least one signature pile support for holding signatures to be fed to said collating conveyor and (ii) signature feed means for feeding a signature from said at least one signature pile support to said collating conveyor;

each hopper section including its own respective drive motor for driving the associated signature feed means; and

each drive motor including its own respective control means for controlling the associated drive motor to control the feeding of signatures from the associated signature feed means to said collating conveyor.

2. A collator according to claim 1 wherein at least one hopper section includes only one signature pile support for holding signatures to be fed to said collating conveyor.

3. A collator according to claim 1 wherein at least one hopper section includes a plurality of signature pile supports for holding signatures to be fed to said collating conveyor.

4. A collator according to claim 1 wherein each control means includes its own respective motor drive for controlling operation of the associated motor.

5. A collator according to claim 4 further comprising a master controller interconnecting said motor drives and for controlling speed of operation and coordinating timing of operation of said motor drives.

6. A collator according to claim 5 wherein each motor drive includes memory means for storing size information of the signatures in the signature pile supports of the respective hopper section.

7. A collator according to claim 6 wherein each motor drive includes means for processing the stored information to provide a signal which is applied to the associated motor to control operation of the motor.

8. A collator according to claim 7 wherein said master controller includes means for downloading information relating to the sizes of signatures from said master controller to each of said motor drives.

9. A collator according to claim 4 wherein each motor drive includes its own respective means for inhibiting operation of the associated motor to inhibit operation of the associated signature feed means.

10. A collator according to claim 1 further comprising means for enabling said signature feed means to be adjusted in a vertical direction toward and away from said collating conveyor.

11. A collator according to claim 1 further comprising means for enabling adjustment of said signature feed means of each hopper section relative to said collating conveyor in a vertical direction toward and away from said collating conveyor.

12. A collator according to claim 1 wherein each control means includes its own respective means for inhibiting

6

operation of the associated drive motor to inhibit the associated signature feed means and thereby to inhibit feeding of signatures from the associated hopper section to said collating conveyor.

13. A collator according to claim 1 wherein each hopper section includes its own respective line drive shaft which is drivingly connected between the associated drive motor and the associated signature feed means.

14. A collator according to claim 13 wherein each control means controls the associated drive motor to drive the associated line drive shaft independently of line drive shafts associated with other hopper sections and thereby to control the feeding of signatures from the associated signature feed means of the associated hopper section to said collating conveyor independently of the feeding of signatures from the signature feed means associated with other hopper sections.

15. A collator according to claim 1 wherein each control means includes its own respective means for changing timing of operation of the associated drive motor relative to said collating conveyor to change timing of operation of the associated signature feed means relative to said collating conveyor and thereby to enable proper feeding of different-sized signatures to said collating conveyor.

16. A collator comprising:

a collating conveyor;

at least one of hopper section located along said collating conveyor, said hopper section including a plurality of signature pile supports for holding signatures to be fed to said collating conveyor;

each signature pile support having its own respective signature feed means for feeding a signature from the associated signature pile support to said collating conveyor;

each signature feeder means including its own respective drive motor for driving the associated signature feed means; and

each drive motor including its own respective control means for controlling the associated drive motor to control the feeding of signatures from the associated signature feed means to said collating conveyor.

17. A collator according to claim 16 wherein each control means includes its own respective motor drive for controlling operation of the associated motor.

18. A collator according to claim 17 further comprising a master controller interconnecting said motor drives and for controlling speed of operation and coordinating timing of operation of said motor drives.

19. A collator according to claim 18 wherein each motor drive includes memory means for storing size information of the signatures in the associated signature pile support.

20. A collator according to claim 19 wherein each motor drive includes means for processing the stored information to provide a signal which is applied to the associated motor to control operation of the motor.

21. A collator according to claim 20 wherein said master controller includes means for downloading information relating to the sizes of signatures from said master controller to each of said motor drives.

22. A collator according to claim 17 wherein each motor drive includes its own respective means for inhibiting operation of the associated motor to inhibit operation of the associated signature feed means.

23. A collator according to claim 16 further comprising means for enabling said signature feed means to be adjusted in a vertical direction toward and away from said collating conveyor.

Attorneys Eyes Only

5,499,803

7

**24.** A collator according to claim **16** further comprising means for enabling adjustment of said signature feed means relative to said collating conveyor in a vertical direction toward and away from said collating conveyor.

**25.** A collator according to claim **16** wherein each control means includes its own respective means for inhibiting operation of the associated drive motor to inhibit the associated signature feed means and thereby to inhibit feeding of signatures from the associated signature pile support to said collating conveyor.

8

**26.** A collator according to claim **16** wherein each control means includes its own respective means for changing timing of operation of the associated drive motor relative to said collating conveyor to change timing of operation of the associated signature feed means relative to said collating conveyor and thereby to enable proper feeding of different-sized signatures to said collating conveyor.

\* \* \* \* \*

Attorneys Eyes Only

GI 099695